**STATE of Oklahoma ex rel. William W. RUCKER, Petitioner,**

v.

**Hon. G. Michael TAPP, Assuming to Act as Judge of the Purported Superior Court of Oklahoma County, Oklahoma, Respondent,**

**Hon. Raymond A. Trapp, Judge of the Superior Court of Kay County, Oklahoma, Intervenor-Respondent.**

No. 40238.

Supreme Court of Oklahoma.

Feb. 19, 1963.

Rehearing Denied March 12, 1963.

Second Petition for Rehearing Denied April 9, 1963.

Hubert Gibson, John D. Cheek, Duke Duvall, Fred M. Black, Fred V. Otto, Fred S. Sanchez, Jimmy Birdsong, Paul Duncan, Frank Miskovsky, Farmer, Kerr & Moslander; George W. Gay, Robert Sherman, Fred M. Mock, Ben Lampkin, Jr., Elliott Fenton, Charles E. Malson, Keys & Theimer, Howard Triggs, Merson & Campbell, Jerry Dick, Harry Merson, Erman S. Price, Richard Swart, Morrison, Rinehart & Cook, Loyd Benefield, Leon Shipp, James W. Shepherd, E. E. Zamrzla, R. R. Williamson, Jr., H. Cook, Oklahoma City, for amici curiae.

B. H. Carey, John E. Green, O. A. Cargill, Oklahoma City, for petitioner.

Grove, Winters & Cloud, Robert G. Grove, James H. Harrod, County Atty. of Oklahoma County, and John M. Amick, Asst. County Atty., of Oklahoma County, Oklahoma City, for respondent.

Maurice H. DeFord, Jr., Duffy & Johnson, Ponca City, James W. Burger, Blackwell, P. E. Irby, James Duley, Northcutt & Northcutt, Felix Duvall, Leonard Geb, Armstrong, Burns & Baumert, Tom L. Irby, Joseph P. Davies, Roy E. Grantham, George Miller, Lester R. Maris, Marland Johnson, Kent Phipps, O. S. Ellifrit, Donald C. Welch, Charles A. Johnson, Ponca City, R. L. Stimpert, Howard Wilson, Cox & Buhrman, Rodgers & Gurley, Blackwell, Clyde Heltzel, Elmer Rutherford, Robert Colcombe, Tonkawa, Ralph C. Haynes, County Atty. of Kay County, Oklahoma, Newkirk, for intervenor, Hon. Raymond A. Trapp.

Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Stagner, Alpern & Powers, Leroy Powers, Wheeler, Parsons, Wheeler, Hampton & Kessler, Spencer Lynn, Smith, Jones & Neuffer, McClelland, Collins, Sheehan, Fauss, Bailey & Bailey, Jay R. Bond, J. A. O'Toole, Berry & Berry, Caldwell & Warren, George Caporal,

PER CURIAM.

The object of this original proceeding is to prohibit the respondent (designated in the caption as "Honorable G. Michael Tapp, assuming to act as Judge of the purported Superior Court of Oklahoma County, Oklahoma") from completing the impaneling of a grand jury and from exercising any judicial authority in Cause No. 219 upon the docket of the Superior Court of Oklahoma County, Oklahoma.

Petitioner—a citizen and resident taxpayer of Oklahoma County—contends that the Superior Court of Oklahoma County is not a legally constituted tribunal since there is no statutory authority for its establishment.

The legal existence of the Superior Court of Oklahoma County depends upon the scope of 20 O.S.1961 § 161. With a view of affording greater clarity in reading, the cited enactment is set forth below in a dismembered form, with an identifying mark placed opposite each separated part:

I. "There is hereby created and established in every county in this State having a population of 33,000 or more and not exceeding 80,000,

(a) and having a city therein with a population of 18,000, or more and not exceeding 50,000,

(b) *and in every county* having a city other than the county seat city with a population of 10,000, or more and not exceeding 50,000,

II. as now or hereafter shown by the preceding Federal census, a court of civil and criminal jurisdiction coextensive with the county to be known as the superior court of such county, which shall be a court of record and shall be held in the largest city of such county." (Emphasis ours).

Respondent contends that the Superior Court was created in Oklahoma County pursuant to the provisions of part (b) and urges that such part is entirely unrestricted by the county population requirements of part (I). On the other hand, petitioner urges that under Sec. 161 a superior court may not be established in a county which, though possessing the urban characteristics of part (b), fails to meet the county population requirements of part I.

This places in issue the following question: Does Sec. 161 authorize the establishment of superior courts (1) In *every county* having a population of 33,000, or more, and not exceeding 80,000, which has a city therein with a population of 18,000, or more, and not exceeding 50,000; and (2) In *every county* which has a city therein, other than the county seat, with a population of 10,000, or more, and not exceeding 50,000, independent and regardless of the county population? Reduced to more specific terms: Does part (b) "and in every county having a city other than the county seat city with a population of 10,000, or more and not exceeding 50,000", operate to create a separate and distinct class of counties in which Superior courts shall be established, independent of any county population requirement?, or is part (b) restricted by the county population requirement of part (I) in the same manner that part (a) is so restricted? (See, Hamrick v. George, Okl., 378 P.2d 324, wherein we, in effect, held that part (a) is restricted by the county population requirements of part (I).

Respondent urges that the enactment is "plain and unambiguous", and hence there is no room left for judicial construction. According to this argument, it is obvious that part (b) provides for the establishment of a superior court *in every county* of the State which has a city therein, other than the county seat, with a population of 10,000, or more, and not exceeding 50,000. If it be conceded, arguendo, that part (b) should be so understood, and the words "and in every county" were to receive what is urged to be their literal meaning, our problem in this case would nonetheless remain unsolved.

In 50 Am.Jur., Statutes, Sec. 226, p. 209, it is stated:

"* * * use may be made by the courts of aids to the construction of the meaning of words used in a statute, even where, on superficial examination, the meaning of the words seems clear. Ambiguity of statutes may arise otherwise than from fault of expression. An ambiguity justifying the interpretation of a statute, is not simply that arising from the meaning of particular words, but includes such as may arise in respect to the general scope and meaning of a statute when all its provisions are examined. The courts regard an ambiguity to exist where the legislature has enacted two or more provisions or statutes which appear to be inconsistent. There is also authority for the rule that uncertainty as to the meaning of a statute may arise from the fact that giving a literal interpretation to the words would lead to such unreasonable, unjust, impracticable, or absurd consequences as to compel a conviction that they could not have been intended by the legislature. * * *". (Emphasis ours.)

As stated in the quoted text, it is not necessary that uncertainty or inconsistency be apparent in the particular words, phrase or clause under consideration; it may arise from the general scope and meaning of the language of a statute, when all of its provisions are examined as a totality. In Sutherland, Statutory Construction, 2 Vol., Sec. 4706, p. 339, it is held:

"The literal interpretation of the words of an act should not prevail if it creates

a result contrary to the apparent intention of the legislature and if the words are sufficiently flexible to admit of a construction which will effectuate the legislative intention. The intention prevails over the letter, and the letter must if possible to read so as to conform to the spirit of the act. * * * *The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be used in the act. * * * *"*. (Emphasis ours.)

If the first four words "and in every county" in part (b) were to be given the construction contended for, the entire context of Sec. 161, for the reasons to be stated, would lead us to an incongruous consequence, namely, that more than one superior court may be created in a single county of the State.

It should be noted that part (a) and (b) are linked together by a conjunctive particle "and", instead of the conjunction "or", and that the word "every" means "each (individual or part) of a class or group whether definite or indefinite in number, *without exception*". Webster's New International Dictionary, Sec. Ed. Thus, if we accord a literal interpretation to the first four words in part (b), it would logically follow that Sec. 161 authorizes the establishment of a superior court "in every county in this State" which meets the requirements of part (I) and (a), *and also* in every county, *without exception*, which has a city therein, other than the county seat, with a population within the limits prescribed in part (b). As a result of this "literal interpretation" we would be impelled to the view that under the terms of Sec. 161 one county may be entitled to two superior courts; for it is not unlikely that a county meeting the population requirement of part (I) (when construed together with 20 O.S.1961 § 182), would have a county seat city with the urban characteristics described in part (a), and also another city therein which falls into the classification of part (b). In such a case the county described in our illustration could establish two superior courts, both to "be held in the largest city of such county" as provided in part II.

■ We can only conclude that such construction would be in manifest conflict with the provisions of part II which clearly contemplates by its terms but one superior court in any county of the State to "be held in the largest city of such county". We therefore hold that the language *"and in every county"*, as these words appear at the beginning of part (b), cannot be accorded a "literal" interpretation without creating incongruous consequences clearly beyond the legislative contemplation and intent. It follows that the provisions of part (b) may not be viewed as creating an all-inclusive group which comprises *every county* in the State but must be restricted in the light of the entire context and in accord with the legislative intent.

■ The words, phrases and sentences of a statute are to be understood as used, *not in any abstract sense,* but with due regard to the context, and in that sense which best harmonizes with all other parts of the statute. Groendyke Transport, Inc. v. Gardner, Okl., 353 P.2d 695, 698; 82 C.J.S. Statutes § 348, p. 723. Words must be interpreted in the light of their context. Davis v. State, Okl.Cr., 300 P.2d 1000.

■ Where adherence is urged to what is asserted as the "strict letter" of a statute, and the literal construction so contended for would lead to an inconsistency or incongruity between different parts of the enactment as they bear upon each other, and would produce consequences clearly beyond legislative contemplation, judicial interpretation becomes necessary to avoid such incongruity and to ascertain the true meaning of the particular words in accord with the legislative intent. 82 C.J.S. Statutes § 322b(3), pp. 588, 589; Sutherland, Statutory Construction, Vol. 2, Secs. 4701, 4702, 4703.

In Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okl. 84, 216 P. 917, 921, it is said:

"It is a cardinal rule that in the construction of statutes the legislative intent must govern, and to arrive at the legislative intent the entire act must be considered, together with all other enactments upon the same subject, and when the intention of the Legislature can be gathered from the entire statute, *words may be modified, altered, or supplied* to give the statute the force and effect which the Legislature intended. * * *" (Emphasis ours)

See also, Board of Ed. of City of Okmulgee v. State Board of Ed., 201 Okl. 32, 200 P.2d 394, Talley v. Harris, supra; Curtis v. Registered Dentists of Oklahoma, 193 Okl. 233, 143 P.2d 427, 429; In re Blain, 197 Okl. 459, 172 P.2d 795, 799.

■ In determining here what meaning should be given to part (b) for the purpose of effectuating the legislative intent and giving proper meaning to that provision, we may properly seek resort to the history of Sec. 161. See, Searcy v. State, 64 Okl. 257, 167 P. 476. In Atlantic Refining Co. v. Okl. Tax Comm., Okl., 360 P.2d 826, 827, it is held:

"Courts, in construing a statute, may with propriety recur to the history of the time when the act was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions of the act as the history of the times during which a law was enacted tends strongly to disclose the reasons for the act and therefore the evils sought to be remedied. And whenever light can be derived from such sources, the courts will take judicial notice of the facts of contemporary history, the prior state of the law, the particular abuse or defect which the act was meant to remedy and will then apply the language of the act to such state of affairs."

In 1909, the Legislature, by enactment of House Bill No. 104, authorized the estab-lishment of a superior court in each county of the state having a population of 30,000, and a city therein of 8,000. (See Session Laws of 1909, Chapter 14, Article 7, page 181). Pursuant to this statute, a superior court was created in Oklahoma County. In 1913, the Legislature, by enactment of House Bill No. 370, amended the 1909 act and authorized the creation of superior courts in counties having a population of 33,000, or more, and having a city therein with a population of 12,000, or more, as shown by the Federal census of 1910. This act also provided that superior courts in counties with a population exceeding 75,000, which stood established under the 1909 law, shall be abolished on the first Monday of January, 1915. (See Session Laws of 1913, Chapter 77, page 119).

In Hatfield v. Garnett, 45 Okl. 438, 146 P. 24, an action was brought challenging the validity of the then Superior Court of Oklahoma County. It was contended that the existence of such court was terminated by the 1913 enactment. In that case it was pointed out that the 1913 act abolished the superior court of Oklahoma County effective on the first Monday of January, 1915, as that county did then have a population in excess of 75,000. The Court said that the act provided "that in counties having a population of more than 75,000, as shown by the Federal census of 1910, said superior court should continue only until the first Monday in January, 1915; and by this provision it is clearly apparent that only Oklahoma county was intended to be affected, * * *".

Although the 1913 act was held to be local and special, and since the constitutional procedure for the passage of such act was not complied with, the same was declared to be invalid, that act clearly demonstrates that the 1913 Legislature intended to abolish all superior courts in the counties with a population in excess of 75,000, effective the first Monday of January, 1915.

During the next session in 1915, the Legislature enacted the act under consideration and based its provisions on population

"as now or hereafter shown by the preceding Federal census". The preceding Federal census (1910) discloses that only Oklahoma County did then have a population in excess of 80,000, to-wit: 85,232. The next county, population-wise, was Muskogee County with a population of approximately 52,700.

A superior court was established in Pottawatomie County under the provisions now under consideration. The 1910 Federal census discloses that Pottawatomie County had then a population of 43,272, which was more than 33,000 and did not exceed 80,000, as provided in the 1915 act, and had a city therein, other than the county seat, with a population of "10,000, or more and not exceeding 50,000," (the City of Shawnee with a population of 12,474). After Shawnee became the county seat, the Superior Court of Pottawatomie County was abolished, effective the first Monday in February, 1935. (See Session Laws of 1933, Chapter 75, page 139).

A superior court was later established also in Seminole County pursuant to the 1915 enactment and the provisions under consideration, after the 1930 Federal census disclosed that Seminole, which was not the county seat, did then have a population of "10,000, or more and not exceeding 50,000," and the County of Seminole had a population within the county population requirement of part (I).

Independent research fails to disclose that a superior court has ever before been established in any county which did not fall within the population limits prescribed by part (I) of Sec. 161, either in its original form or as affected by Sec. 182. The sole exception is the superior courts here considered. The superior court was created in Oklahoma County in April 1962, although that County, if entitled to the present court, would have been eligible for its establishment much earlier by virtue of the 1950 Census.

If part (b) did begin with the disjunctive connective "or" in lieu of the words "and in every county", it would be clear that the county population requirements of part I were also applicable to part (b). On the other hand, if the phrase "in every county" had not been repeated in part (b), but was omitted therefrom, no county could qualify for the establishment of a superior court unless it fell into all three classifications and met the requirements of part I and part (a) as well as part (b).

The terms of part (b) concededly create an alternative group of counties eligible for creation of a superior court. This group may not be held to extend to *all counties* of the State without creating a manifest incongruity. In the light of the legislative history which precedes the passage of Sec. 161, we conclude that the provisions of part (b) must be restricted to those counties which fall within the population requirements of part I, but do not meet the urban characteristics of part (a). Since the population of Oklahoma County is in excess of 80,000—the maximum prescribed in part I—a superior court may not be established therein under the terms of Sec. 161.

This construction of Sec. 161 is in accord with our earlier expressions in Herndon, Judge v. Anderson et al., 165 Okl. 104, 25 P.2d 326, 329. In the cited decision we had under consideration Sec. 161, and although the precise question here was not there in controversy, we did then view that statute as limited in its scope to counties having a population of less than 80,000.

Therein we said:

*"The act [20 O.S.1961, Sec. 161] which created the superior court provided for such a court in counties having a population between 33,000 and 80,000. It was urged in the argument that this* was an arbitrary classification and that *counties with a population exceeding 80,000 would be unable to have a superior court and that no provision had been made for higher brackets.* However, the classification as made was exclusively within the province of the Legislature. It might be anticipated that the Legislature would provide some other form of relief, if necessity required it, for such counties in the way

of an additional district judge or by creating some other court in such county to take care of the business necessitated by the increase of such population. * * *" (Emphasis ours). See also Bell v. Crum, 188 Okl. 67, 106 P.2d 518, 521.

■ As we view Sec. 161, the Legislature recognized the need for superior courts in counties within certain population limits and possessing certain alternative urban characteristics. Of these counties, those having a city with a population of 18,000, but not more than 50,000, *or* having a city therein, other than the county seat, of 10,000 and not exceeding 50,000 people, were selected for the situs of such court.

The next proposition to be resolved is whether prohibition affords the proper remedy for arresting the continued operation of an illegally constituted tribunal.

■ Ordinarily, neither prohibition nor mandamus is available to try the title to an office, and an action in the nature of quo warranto will be deemed to constitute the exclusive remedy. Kile v. Graham, 108 Okl. 179, 235 P. 524; 48 C.J.S. Judges § 6b, p. 957; Green v. Sammons, 142 Okl. 36, 284 P. 1115. The remedy of prohibition may be resorted to only in cases of usurpation of jurisdiction or power. Koch v. Keen, 124 Okl. 270, 255 P. 690.

■ The object of the present proceeding is not to try respondent's title to his office. Petitioner challenges the legal existence of *the court* on the grounds that there is no statutory authority for its establishment. It is not the right to an office that is at issue. The question is whether there is in operation a legally constituted tribunal. There is a marked distinction between an action to determine one's title to an office and a challenge to the legal existence of a court.

Under the terms of Sec. 2, Art. VII, Okl. Const. this court is vested with the general superintending control over all courts inferior to it. When the legal existence of an inferior tribunal in operation in this state is directly drawn in question, as it is here. public interest demands a speedy determination of the challenge to prevent chaos and confusion in the orderly processes of judicial administration. Koch v. Keen, supra.

Since, as we have concluded, a superior court may not function in Oklahoma County under the present statutes, respondent is acting as a judge of a tribunal whose continuing existence would constitute a clear act of usurpation of the jurisdiction conferred by the Constitution and statutory law upon the District Court and other courts of original or concurrent jurisdiction. Our duty unmistakably commands that such usurpation be arrested and that respondent be ordered to cease and desist from acting as a judge of the Superior Court of Oklahoma County. We must therefore intercede by a writ of prohibition.

As indicated by the style of this case, the Honorable Raymond A. Trapp, Judge of the Superior Court of Kay County, has intervened herein and requested that he be made a respondent. This, of course, is an unusual procedure. However, since only pure questions of law are presented, and inasmuch as a question of great public interest and importance to the people of Kay County and the State is involved, we have permitted Judge Trapp to intervene and will now consider whether a Superior Court of Kay County can be legally created and established under existing laws.

It is contended that Kay County is entitled to a superior court under Title 20 O.S. 1961 § 161, for the reason it has "a city other than the county seat city with a population of 10,000, or more and not exceeding 50,000," to-wit: Ponca City. What we have said heretofore with regard to the meaning and effect of Sec. 161, applies with equal force to Kay County. Therefore, to be entitled to a superior court, Kay County must not only have "a city other than the county seat city" within the population requirement above set forth, but must also meet the county population requirements set forth in Sec. 161.

In the case of Hamrick v. George, supra, we held that Title 20 O.S.1961 § 182, which provides in part as follows:

"The superior court in any county or counties in the State of Oklahoma having a population of less than 52,000, according to the last preceding Decennial Federal Census, is hereby abolished. * * *"

had the effect of increasing the minimum county population requirement of Sec. 161, from 33,000 to 52,000.

It is conceded that Kay County has a population of less than 52,000. Since Kay County does not meet the county population requirement prescribed by Sec. 161, construed together with Sec. 182, we hold that no superior court can be established in Kay County under the existing laws.

Since we have determined that Oklahoma County and Kay County do not qualify for a superior court under existing laws, considerable confusion will be created in the minds of litigants concerning the status of cases which have been heretofore disposed of, and in which orders have heretofore been made, unless attention is given to the problem.

In Hamrick v. George, supra, we concluded that the Judge of the Superior Court of Carter County should cease and desist from further acting in that capacity. We held, however, that all of his official acts, performed before this court's opinion became final while discharging his duties as judge, were to be deemed and treated as valid in like manner as those of a de jure judge. We directed that, upon final decision by this court, all civil and criminal cases, both adjudicated and pending in the Superior Court of Carter County and all books, records, dockets and files, be transferred by the Court Clerk to the District Court or to other courts of said county which may be vested with original or concurrent jurisdiction in such cases, all as provided by law. What we said in the Hamrick v. George case is applicable in the present proceeding.

We do not intend to establish a hard and fast rule as to when an office will or will not support the status of a de facto officer. We do think, however, that the same reasons should be applied here as those followed by us in Chicago, R. I. & P. Ry. Co. et al. v. Carroll, et al., 114 Okl. 193, 245 P. 649, wherein we held that an unconstitutional law establishing an office may, until such law has been declared to be unconstitutional, be regarded as conferring color of title sufficient to support the de facto status of the incumbent.

By governing ourselves by this reasoning, we are led to the conclusion that where, as here, the Governor, in reliance upon a requested opinion of the Attorney General advising him that a judicial office does in fact exist, fills a vacancy in the supposed office, and the appointee proceeds, with general public recognition, to discharge the duties thereof before a decision is reached by this court holding such office to be non-existent, it would be contrary to public policy to strike down, as void, the judicial acts of such appointee. This principle finds sanction in our own statutes. See, Title 21 O.S.1961 §§ 261 and 262.

We therefore hold that all of the official acts of Honorable G. Michael Tapp, Judge of the Superior Court of Oklahoma County and of Honorable Raymond A. Trapp, Judge of the Superior Court of Kay County, performed by them, before this opinion becomes final, while discharging their duties as Judges of their respective courts, shall be deemed and treated as valid in like manner as those of a de jure judge.

When this decision becomes final, all civil and criminal cases, both adjudicated and pending in the Superior Court of Oklahoma County and in the Superior Court of Kay County, and all books, records, dockets and files of each court, shall be forthwith transferred by the respective court clerks to the District Court or to other courts of those counties which may be vested with original or concurrent jurisdiction in such cases, all in conformity with the provisions and authority contained in Title 19 O.S.

1961 §§ 221 and 221.1 and Title 20 O.S.1961 §§ 643 and 644, and other applicable statutory provisions; and it is so ordered.

All further proceedings in Cause No. 219 are ordered terminated, and all prospective grand jurors are hereby discharged. The respondent judge, Honorable G. Michael Tapp, is hereby prohibited from further proceeding in said cause. After said cause has been transferred to the District Court of Oklahoma County in conformity with this opinion, any and all proceedings in said cause shall terminate without further order, and no other proceedings shall be had in said cause, except payment of any costs or fees theretofore incurred.

The Superior Courts of Oklahoma County and Kay County are declared to be unauthorized by law. Writ of prohibition granted against respondent and intervenor.

BLACKBIRD, C. J., HALLEY, V. C. J., and WELCH, DAVISON, JOHNSON and IRWIN, JJ., concur.

JACKSON, J., concurs as to Kay County; concurs in results as to Oklahoma County.

WILLIAMS, J., concurs in results as to Kay County; dissents as to Oklahoma County.

BERRY, J., concurs as to Kay County; dissents as to Oklahoma County.

BERRY, Justice (dissenting).

The Superior Court of Oklahoma County is not allowed to continue in operation because the majority concludes that part (b)* of Sec. 161 must be "restricted" in its scope by the county population classification prescribed in part (I). My disagreement with the course which the Court has taken in the present case is based on two considerations —First, it is my view that the use of interpretative devices to construe Sec. 161 is unwarranted by the remote and purely anticipatory nature of the "Incongruity"

which the Court finds in the statutory language and which it seeks to avoid; Second, the restriction placed upon plain and unambiguous statutory language is based on most obscure and unconvincing extrinsic aids.

If, for the sake of argument, I should be willing to assume, only as a matter of mere speculative possibility, that literal interpretation of the word "every" in part (b) might cause the two alternative county categories to overlap *some day* in the future, I view such *remote, hypothetical eventuality* (of having "double courts" in one county) as being without a legally valid basis for *presently* declaring the statute "incongruous." This view seems especially cogent here, because Oklahoma County will *never* qualify for more than one superior court since it cannot *possibly* fall within any class other than that created in part (b). My independent research has led me to no legal precedent which authorizes a court, in considering a statute, to assume a remote hypothetical "incongruity" as a basis for finding the language uncertain as to its meaning and for employment of extrinsic aids in order to change what clearly appears to be plain and unambiguous wording.

Neither am I convinced that the Legislature intended by this enactment that *in no future case* should one county be allowed to fall within both of the alternative and independent classes created by Sec. 161. If such intent should be apparent and the statute contemplates but one superior. court in any single county, the sweeping restriction of part (b) need not be imposed. The word "every" could still be construed here to mean what it says and the "incongruity" avoided when a proper case for its consideration is presented. The Oklahoma County case, I reiterate, does not and cannot produce the inconsistency which the Court seeks to avoid. As applied to Oklahoma County, the incongruous consequence is apparent only by assumption of a future hypothetical attempt at an extension of Sec.

(* The marks (b) and (I) are used in the same manner and identify the same

portions of Sec. 161 as in the majority opinion.)

161 to allow establishment of "double" courts in one county.

It is, therefore, my view that in so far as Oklahoma County is affected, there exists no incongruity, present or future, and the statute must be taken as plain and unambiguous.

From our past decisions I find these quotations applicable:

In re Martin's Estate, 183 Okl. 177, 80 P.2d 561, 563, 564:

"If we are to examine into the history of the legislation and contemporaneous circumstances, we are compelled to admit that the act is ambiguous. * * * If such statutes are clear and unmistakable in the language employed therein, they must generally be accorded their literal meaning. Whether the results accord with right, and justice, and logic, in the eyes of the court, is a question of no judicial concern.

&ast; &ast; &ast; &ast; &ast; &ast;

"In view of the fact that there is nothing contained in the present act that would cast a cloud upon the intent of Congress therein expressed, we will not go outside the same for information in aid of its interpretation. * * *"

Oklahoma Tax Commission v. Board of County Commissioners, 200 Okl. 240, 192 P.2d 668:

"Where the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.

"The rule that statutes should be construed so as to avoid absurd consequences applies only where the statute is subject to interpretation, not where the legislative intent is clearly expressed."

Whittier v. Murrell, Okl., 362 P.2d 694, 696:

"* * *. It is not this Court's prerogative to distort plain language in order that a more plausible or workable result might be obtained."

To me, there is no cogent indication in the history of Sec. 161 that part (b) was intended to be restricted by the county population class of part (I). In this respect, any view is at most a matter of pure conjecture—since the extrinsic aids are largely obscure. If I had been convinced that a present "incongruity" does exist and judicial interpretation would be in order, I might have concluded, with equal force of logic and support, that in part (b) the Legislature intended to authorize the establishment of a superior court in *every county* of the state, with the urban characteristics specified therein, where the county seat city was second in importance and size to some other municipal community in the county. In other words, I would construe part (b) to mean "and in every (other) county having a city other (and larger) than the county seat city * * *". This construction clearly demonstrates that there is no indication of legislative intent to place part (b) in the county population class of part (I).

Since I am of the opinion that there exists no incongruity in so far as Oklahoma County is affected by Sec. 161, and since there is no persuasive proof outside of the language of the statute that the Legislature intended to restrict part (b) by the provisions of part (I), I respectfully dissent from the Court's decision as to Oklahoma County. I concur with the majority in the present disposition as to Kay County because, in my view, Sec. 182 does operate to prospectively inhibit the establishment of superior courts in all counties of the State having a population of less than 52,000 people.

I am authorized to state that WILLIAMS, J., concurs with me in this dissenting opinion.

Rehearing denied.

WILLIAMS and BERRY, JJ., dissent.